IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SHARON MORNINGRED, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : C. A. No.: 10-272-MPT |
| | : |
| DELTA FAMILY-CARE & SURVIVORSHIP | : |
| PLAN, SEDGWICK CLAIM | : |
| MANAGEMENT SERVICES, INC. | : |
| | : |
| Defendants. | : |

## MEMORANDUM ORDER

Sharon Morningred filed suit against Delta Airlines, the Delta Family-Care & Survivorship Plan ("the Plan") and Sedgwick Claim Management Services (Sedgwick CMS) alleging a violation of § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA).[1] Morningred asserts that Sedgwick CMS, the delegated administrator of the Plan, arbitrarily and capriciously denied her short-term disability benefits following a workplace injury. Defendants filed a motion for summary judgment arguing that Sedgwick CMS's decision to deny Morningred continued short term disability benefits for the period between July 1, 2008 to November 28, 2008 was neither arbitrary nor capricious. Morningred argues that Sedgwick CMS's review of her case failed to consider all of the relevant diagnoses, the opinion of her treating physician, and a workers' compensation agreement finding that Morningred was totally

---

[1] 29 U.S.C. § 1132(a)(1)(B).

1

disabled. For the reasons stated herein, the court grants in part and denies in part defendants' motion for summary judgment, grants in part and denies in part Morningred's cross-motion for summary judgment, and finds that the denial of Morningred's continued short-term disability benefits within a specific time-period was not supported by substantial evidence.

**I.     Factual and Procedural History**

At the time of her injury, Morningred was employed as a rotating Baggage Service Agent, Ticket Counter agent, Lobby and/or Lobby Assistant Agent, and/or Gate Agent. These jobs required she be able to lift bags of luggage weighing between 70 and 99 pounds. On an average work day, Morningred lifted 400 bags and 500 pieces of freight or mail. Her job also required that she be able to work eight and one-half hours per day, and be capable of walking, pushing, pulling, lifting, reaching, bending, and kneeling.

At work on May 29, 2008, Morningred slipped and fell on a puddle of water. According to a medical examination conducted that same day, Dr. Louis Lam reported that Morningred complained of pain in her left knee and both ankles. Dr. Lam diagnosed a cervical strain, a right shoulder sprain, a right elbow strain, a right wrist strain, a lumbosacral strain, a left knee contusion, and a bilateral ankle strain. X-rays taken at that time showed that Morningred had not suffered a fracture or dislocation of her ankle or knee. Morningred subsequently began receiving treatment from her physician, Dr. Debra Hudes, who noted that Morningred was unable to work.

The Delta Family-Care & Survivorship Plan provides short-term and long-term disability benefits to eligible participants who suffer an injury while at work. Morningred

applied for short-term disability benefits under the Plan. Short-term disability benefits require a demonstration that the claimant is "unable to engage in [her] customary occupation as a result of a demonstrable injury or disease . . . ."[2] Pursuant to sections 12.02(i) and 12.04, the Plan delegates claim administration duties to Sedgwick CMS and, pursuant to a service agreement contract, Sedgwick CMS is granted all discretionary power to interpret the Plan and make benefit determinations. By a letter dated June 17, 2008, Sedgwick CMS approved short-term disability benefits for the period between May 31, 2008 through June 30, 2008. The letter noted that if, at the end of the benefit period, Morningred was unable to resume her employment duties, additional medical documentation would be required to approve further benefits.

Following the expiration of the initial short-term disability benefits, Morningred sought re-certification of benefits under the Plan and submitted further medical documentation in support of a diagnosis of complex regional pain syndrom ("CRPS"). According to an August 6, 2008 report, Morningred's orthopedic surgeon Dr. Eric Johnson diagnosed CRPS in her left lower extremity and recommended physical therapy.

Via letter on September 30, 2008, Sedgwick CMS denied the claim, citing "no objective medical documentation to support [the] diagnosis [and] no consistent treatment plan, other than physical therapy, appropriate for this diagnosis."[3] The letter concluded by informing Morningred of her right to administratively appeal the decision and advised her to submit information from all physicians who treated her including

---

[2] D.I. 31, Ex. A at DPPlan060062.
[3] D.I. 31, Ex. C at SMM 00507.

narrative reports and physical limitations, her course of treatment, frequency of doctor's visits, medications prescribed, the diagnostic studies conducted during that period including test result, X-rays and clinical findings, and any other information specific to the condition or that may help in reviewing the claim.

Morningred appealed the decision on October 16, 2008, stating that although she had been cleared to return to work in a sedentary position, her manager disallowed her return until medical notice that she could return to her "normal functions within 60 days." She stated her doctor was unwilling to provide such a diagnosis. She expressed interest in returning to work in a sedentary position as soon as possible and stated that she was willing to transfer to Atlanta for such work. To support her claim of CRPS, Morningred submitted hundreds of pages of medical records to Sedgwick CMS.

Sedgwick CMS forwarded the records to Insurance Appeal Limited to perform an independent review. On March 4, 2009, Insurance Appeal Limited issued a report concluding that due to the lack of physical damage and because of a normal electrodiagnostic test, Morningred should have been able to return to work as of July 1, 2008 through November 28, 2008.

Sedgwick CMS subsequently upheld the denial of short-term disability benefits by a letter dated April 8, 2009. Morningred filed this action on April 6, 2010. Defendants filed a motion for summary judgment on December 8, 2010. Morningred filed her answering brief on January 20, 2011 to which defendants replied on February 1, 2011.

**II.     Standard of Review**

Where an ERISA plan grants the administrator discretionary authority to determine eligibility for benefits, the court reviews a § 502(a)(1)(B) challenge to a

4

termination of benefits under an arbitrary and capricious standard.[4]  The Plan affords the delegated administrator discretion in virtually all aspects concerning interpretation and administration of the Plan including "[t]he discretionary authority to interpret and construe the Plan, and decide all questions of eligibility of any Employee . . ."[5]  "Under the arbitrary or capricious (or abuse of discretion) standard of review, the District Court may overturn a decision of the plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law."[6]  The court will review the procedural factors underlying the administrator's decision-making process and will "determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together."[7]  That court's review of these determinations is based "on the record available to the plan administrator in making its own decision; if there is not sufficient evidence in the defendants' record to support their decision . . . it must be reversed."[8]

In her answering brief in opposition to defendants' motion for summary judgment, Morningred asks the court to enter summary judgment in her favor *sua sponte* arguing that "district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*."[9]  Although defendants recognize Morningred's request, and constructively acknowledge that they are on notice to submit with all of their evidence, the court cautions Morningred that the proper avenue for relief in this situation is a

---

[4] *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115-16 (2008).
[5] D.I. 31, Ex. A at DPPlan060045.
[6] *Steele v. Boeing Co.*, 225 F. App'x 71, 74 (3d Cir. 2007).
[7] *Glenn*, 554 U.S. at 117.
[8] *Kosiba v. Merck & Co.*, 384 F.3d 58, 69 (3d Cir. 2004).
[9] *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).

cross-motion for summary judgment, not a request for the court to act *sua sponte*. Because of the nature of this claim and because of defendants' recognition of Morningred's request that the court treat her answer as a motion for summary judgment, the court will treat the briefing as cross-motions for summary judgment.[10]

A motion for summary judgment should be granted where the court finds no genuine issues of material fact from its examination of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, and that the moving party is entitled to judgment as a matter of law.[11] A party is entitled to summary judgment where "the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party or where the facts are not disputed and there is no genuine issue for trial."[12]

This standard does not change merely because there are cross-motions for summary judgment.[13] Cross-motions for summary judgment

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.[14]

Moreover, "[t]he filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party."[15]

---

[10] *Id.* (finding that a district court may enter summary judgment *sua sponte* "so long as the losing party was on notice that she had to come forward with all of her evidence.").
[11] *Ford v. Unum Life Ins. Co. of Am.*, 465 F. Supp. 2d 324, 330 (D. Del. 2006).
[12] *Delande v. ING Employee Benefits*, 112 F. App'x 199, 200 (3d Cir. 2004).
[13] *Appleman's v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).
[14] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).
[15] *Krups v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).

**III.    Discussion**

   A. Initial Denial Letter

ERISA requires that a compliant plan "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant."[16] The accompanying regulations set forth "minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries."[17] The regulations require a plan administrator to provide written notification of any adverse benefit determination setting forth

> [I]n a manner calculated to be understood by the claimant ... (i) [t]he specific reason or reasons for the adverse determination; (ii) [r]eference to the specific plan provisions on which the determination is based; (iii) [a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary[.][18]

Sedgwick CMS's initial denial letter, dated September 30, 2008, denied Morningred's short-term disability benefit recertification claim because there was "no objective medical documentation to support [the] diagnosis."[19] The letter also noted that in Dr. Johnson's diagnosis report, "there appears to be no consistent treatment plan, other than physical therapy, appropriate for this diagnosis."[20] In her answering brief, Morningred argues that the initial denial letter is impermissibly vague concerning the type of medical information necessary to cure the defect in her claim.

---

[16] 29 U.S.C. § 1133(1).
[17] 29 C.F.R. § 2560.503-1(a).
[18] *Id.* § 2560.503-1(g)(1).
[19] D.I. 31, Ex. C at SMM 00507.
[20] *Id.*

Although an ERISA beneficiary may bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of his plan, or to clarify his rights to future benefits under the terms of the plan,"[21] the court generally will not entertain an ERISA claim unless the plaintiff has exhausted the remedies available under the plan.[22] "Courts require exhaustion of administrative remedies 'to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned.'"[23]

The initial denial letter requested that Morningred include in her appeal, "the reason(s) you believe your claim was improperly denied . . . ."[24] Morningred did not outline any procedural defect in her appeal letter and does not direct the court to any other point in the administrative record demonstrating an appeal of this alleged procedural defect in Sedgwick CMS's initial denial letter. Where ERISA requires claimants first address their complaints to a designated fiduciary to whom Congress, in Section 503, assigned the primary responsibility for evaluating claims for benefits, the court will not intervene.[25] As a result, the court finds that Morningred has waived this

---

[21] 29 U.S.C. § 1132(a)(1)(B).
[22] *Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990).
[23] *Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 249 (3d Cir. 2002) (quoting *Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir. 1980)).
[24] D.I. 31, Ex. C at SMM 00508.
[25] *Zipf v. Am. Tel. And Tel. Co.*, 799 F.2d 889, 892 (3d Cir. 1986) ("'When a plan participant claims that he or she has unjustly been denied benefits, it is appropriate to require participants first to address their complaints to the fiduciaries to whom Congress, in Section 503, assigned the primary responsibility for evaluating claims for benefits.").

issue by her failure to raise it on appeal to the plan administrator.[26]

B. Analysis of All Relevant Diagnoses

The Third Circuit has found that "[a]n administrator's failure to address all relevant diagnoses in terminating a claimant's benefits is [a] cause for concern that suggests the decision may have been arbitrary and capricious."[27] Morningred argues that although Sedgwick CMS documented in its claims files "objective criteria for CRPS," the administrator ignored the treating physicians' observations of those objective criteria.

Sedgwick CMS's notes summarize the clinical signs and criteria necessary to diagnose CRPS.

> The objective diagnostic criteria for CRPS are comprised of eight criteria, six clinical signs and two radiographic signs. The six clinical signs are: swelling, local skin color change of red or purple, local sweating changes, local temperature changes, reduced passive range of motion in contiguous or contained joints, local alteration of skin texture . . . . To identify the existence of radiographic signs, a triple-phase bone scan may be used to reveal osteoporosis or increased circulation to the joints in the affected areas.[28]

In response to these criteria, Morningred counters that the submitted medical records show diagnoses outlining these very criteria. In support of "swelling,"

---

[26] The court notes that Morningred cites to *Skretvedt v. E.I. DuPont de Nemours and Co.*, 268 F.3d 167, 178 n.8 (3d Cir. 2001) wherein the Third Circuit expressed its discomfort with a plan's request for "objective medical evidence." In *Skretvedt*, the claimed disability was a psychological condition whereas in the instant case, the National Institute of Health has outlined specific symptoms for CRPS and has identified certain tests that may be helpful in diagnosing the condition. *See Complex Regional Pain Syndrome Fact Sheet* (Feb 18, 2011), http://www.ninds.nih.gov/disorders/reflex_sympathetic_dystrophy/detail_reflex_sympathetic_dystrophy.htm#174993282.

[27] *Miller v. Am. Airlines, Inc.*, 2011 WL 208291, at *12 (3d Cir. 2011) (citing *Kosiba v. Merck & Co.*, 384 F.3d 58, 68-69 (3d Cir. 2004)).

[28] D.I. 31, Ex. C at SMM 00071.

Morningred points to a December 11, 2008 report by Dr. Bruce H. Grossinger finding "edema in the left ankle,"[29] an August 6, 2008 report by Dr. Johnson finding "expected swelling"[30] and a October 31, 2008 visit report by Dynamic Physical Therapy noting "significant increase in left lower extremity edema."[31] To demonstrate the presence of local skin color change, Morningred directs the court's attention to a September 30, 2008 report by Dr. Robert Varipapa describing a "[v]ery slight discoloration and slight coldness of the left lower extremity in comparison to the right"[32] as well as a notation by Dr. Grossinger stating that he "reviewed a sequential packet of photographs which reflect the discoloration, swelling and deformity of the left knee and ankle." Morningred similarly illustrates examples where these and other doctors noted symptoms similar to the listed objective diagnostic criteria.

In rebuttal, defendants argue that although Dr. Veripapa noted "some discoloration," he also remarked that Morningred had been subjected to an "extensive evaluation including a variety of MRI studies of the spine and leg along with EMG studies which have been negative."[33] Defendants also reference a September 22, 2008 electromyographic report prepared by Dr. Wai Won Phoon noting Morningred's normal deep tendon reflexes, fair strength, and normal sensations.[34]

In further support of their findings, defendants cite to a report from a neurologist, Dr. Howard I. Levin concluding that "the array of symptoms [Morningred described] are

---

[29] D.I. 38 at B0298.
[30] D.I. 37 at B0064.
[31] *Id.* at B0143.
[32] *Id.* at B0060.
[33] *Id.* at B0061.
[34] D.I. 31, Ex. C at SMM 00439.

10

clearly inconsistent and out of proportion to the injuries and cannot be support by any findings on her examination or diagnostic studies."[35] Levin stated that while Morningred's symptoms "suggest that she is suffering from complex regional pain syndrome or disuse syndrome," there was no evidence that would account for the symptoms in her neck, upper back, or left knee.[36] Levin recommended that Morningred should emphasize mobility and that inactivity may have caused the problems in her left leg.[37] Finally, Levin advised that Morningred was unable to return to her previous position at that time but should have been able to work in a sedentary position.[38]

Following Morningred's supplemental submission, Sedgwick CMS referred her claim to Insurance Appeal Limited to perform an independent review. On March 4, 2009, Insurance Appeal Limited issued a report in which the reviewing doctor, Dr. Robert L. Marks, summarized the medical evidence submitted, outlined his attempts to discuss Morningred's claim with her physicians, and concluded that the description of the injury and the described findings did not support physical disability from claimant's regular unrestricted job from July 1, 2008 through November 28, 2008.[39] According to Marks, the record "indicated that there [was] swelling and tenderness [but] [i]maging revealed only mild degenerative changes. Although a fall could have caused a sprain injury, the lack of solid physical findings of major severity is not supportive of complete disability from work (following the six to eight weeks of convalescence)."[40] Marks opined

---

[35] *Id.* at SMM 00188.
[36] *Id.*
[37] *Id.* at SMM 00199.
[38] *Id.*
[39] *Id.* at SMM 00038.
[40] *Id.*

11

that "tenderness and even [range of motion] limitations can be more related to subjective experiences (particularly in the presence of anxiety or fear) rather than actual organic anatomic abnormalities," and opined that swelling and discoloration may be caused by lack of mobilization.[41]

Marks subsequently explained the rationale behind his conclusion stating that the "various symptom complaints involve areas remote from the ankle so that reflex sympathetic dystrophy or complex regional pain syndrome cannot explain the entire clinical presentation."[42]

In the presence of conflicting medical opinions proffering varying causes of Morningred's disability and her ability to return to work, the Plan granted Sedgwick CMS complete discretion to weigh the conflicting evidence and render a decision. As a result, the court does not find any abuse of that discretion in Sedgwick CMS's decision to credit the opinions of certain medical evidence over other contrary medical evidence.[43]

### C. Consideration of Morningred's Treating Physician's Opinions

In December of 2008, Morningred's counsel referred her to Dr. Bruce Grossinger, a certified independent examiner. In a December 22, 2008 letter to Dr. Johnson, Dr. Grossinger found that Morningred had "a multiplicity of traumatic injuries."[44] He recounted Morningred's medical history, described her symptoms, and described his physical examination of Morningred.[45] He concluded that Morningred had reflex

---

[41] *Id.* at SMM 00039.
[42] *Id.*
[43] *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831-34 (2003).
[44] D.I. 38 at B0298.
[45] *Id.*

sympathetic dystrophy ("RSD") of the left lower extremity . . . [and] clearly cannot return to working as a baggage service agent, repetitively lifting and carrying bags and suitcases up to 100 lbs."[46] He found that Morningred would require mobilization and gentle stretching but that she was temporarily disabled from any and all gainful employment on a temporary basis, until she received benefit from her treatment.[47] Finally, Dr. Grossinger indicated that he would remain her treating physician.[48] Morningred argues that neither the initial letter from Sedgwick CMS denying benefits nor the final letter denying benefits mentioned, described, or explained Dr. Grossinger's opinions or Sedgwick CMS's "sole total reliance" upon the records exam performed by Dr. Marks.

In *Nord*, the Supreme Court stated that although Plan administrators were not required to "accord special weight to opinions of a claimant's physicians," they "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."[49]

The initial denial letter is dated September 30, 2008 - approximately two months before Morningred first visited Dr. Grossinger and five months before Dr. Marks' letter summarizing his review of Morningred's medical information. As a result, the court finds no violation of the Supreme Court's edict that plan administrators weigh all credible evidence as it concerns Dr. Grossinger's findings.

At the onset, the final denial letter states that Sedgwick CMS reviewed records

---

[46] *Id.* at B0298-99
[47] *Id.* at B0299.
[48] *Id.* at B0300.
[49] *Nord*, 538 U.S. at 833.

13

from a number of doctors, rehabilitation and therapy centers, and medical specialists. Included in that list was Dr. Grossinger. The letter then describes Dr. Marks' attempts to contact Morningred's physicians and his discussions with the doctors he contacted. It states that Dr. Marks was unable to schedule a teleconference with Dr. Grossinger. However, the letter recounts Dr. Michael Kelman's observations that Morningred complained of low back and lower extremity pain, that she was ambulating with an aircast and crutch, and that she was unable to perform her regular job duties. It also recounts Dr. Trent Ryan's finding that Morningred had some swelling, hypersensitivity to touch, flexor spasms, that she required crutches, and that she was incapable of performing her job duties. The letter provides that a "thorough review of the available medical documentation in the file indicated that [Morningred complained] of a sprained ankle and low back,"[50] she was diagnosed with RSD and CRPS, and that examination findings "revealed tenderness and [her] imaging studies revealed mild degenerative changes."[51]

Besides Dr. Grossinger's conclusion regarding Morningred's ability to work and his diagnosis of CRPS, Morningred does not identify any diagnosis or specific symptom that Sedgwick CMS and Dr. Marks failed to acknowledge. The letter clearly recognizes that Morningred had been diagnosed with CRPS and at least two doctors had found her condition to be totally disabling. Dr. Marks' opinion states that he reviewed "PROG NOTES" from "Grossinger NeuroPain Specialists."[52] Although he did not specifically describe Dr. Grossinger's diagnosis of CRPS, he recognized that Morningred had been

---

[50] D.I. 31, Ex. C at SMM 00033.
[51] *Id.*
[52] *Id.* at SMM 00035.

diagnosed with CRPS and explained that the "various symptom complaints [involving] areas remote from the ankle" cannot be explained by CRPS or RSD. He explains that, because "[t]here is no evidence of major structural damage to the ankle," he determined that Morningred had suffered a sprain injury from which she should have healed after a few weeks of convalescence. [53] He concluded by stating that "in the absence of structural damage and a normal electrodiagnostic test," Morningred required activation and progressive mobility and should have been able to return to work as of July 1, 2008 to November 28, 2008. The court finds that Sedgwick did not arbitrarily refuse to credit Dr. Grossinger's medical opinion, but instead gave more weight to Dr. Marks' contrary medical opinion. In the presence of competing medical opinions, the plan administrator is granted discretionary power to weigh the conflicting evidence.[54] As a result, the court cannot find that Sedgwick CMS acted arbitrarily or capriciously because of a failure to recognize or acknowledge Morningred's treating physicians.

    D. Worker's Compensation Claim

According to Morningred, she and Delta Airlines entered into a Workers' Compensation Agreement on July 16, 2008,[55] wherein the parties agreed that Morningred was totally disabled. Delta reaffirmed this agreement and Morningred's total disability via a subsequent State of Delaware "Agreement as to Compensation."[56] Morningred argues that Sedgwick CMS's failure to explain the disagreement between its

---

[53] *Id.* at SMM 00039.
[54] *Nord*, 538 U.S. at 831-34.
[55] D.I. 36 at 2. Morningred cites to D.I. 37 at B0001 as evidence of this agreement. Due possibly to a typographical error, that evidence is not found at the citation noted and the court is unable to draw a conclusion from the evidence found.
[56] D.I. 37 at B0028.

15

conclusion and the worker's compensation agreement calls into question the neutral character or fairness of the administrator's decision.

The Third Circuit has stated that a "settlor of an ERISA plan is not required to incorporate worker's compensation standards into the plan, and unless such standards are incorporated [there is] no reason why they should bind the plan's trustees or administrator."[57] There is no evidence that the Plan incorporates any such standards into the decision-making process. Additionally, Morningred does not state and the agreement does not provide a definition of "disability" as it applies to the workers' compensation claim, the reason for Morningred's disability under the workers' compensation claim, or the medical evidence that led to the total disability finding. Without more, the court cannot determine that an unbinding workers' compensation agreement is evidence of the administrator's arbitrary and capricious denial of benefits.

D. Calculation of Morningred's Disability

In their briefing, defendants acknowledge that "had [Morningred] been encouraged to return [to work], Dr. Marks felt that she would have been able to return to work as of July 1, 2008 [and that] it was this opinion questioning [Morningred's] condition and its effect on her ability to work on which Sedgwick CMS ultimately relied."[58] In his review, Dr. Marks repeatedly states his opinion that, with proper treatment, Morningred should have been able to return to work after a six to eight week

---

[57] *Moats v. United Mine Workers of Am. Health and Ret. Funds*, 981 F.2d 685, 689 (3d Cir. 1992) (citing *Kunstenaar v. Connecticut General Life Ins. Co.*, 902 F.2d 181 (2d Cir. 1990); *Brown v. Ret. Comm. of Briggs & Stratton Ret. Plan*, 797 F.2d 521 (7th Cir. 1987); *Glover v. South Central Bell Tel. Co.*, 644 F.2d 1155 (5th Cir. 1981); *McNamara v. Journal Co.*, 581 F. Supp. 927 (E.D. Wisc. 1984); *Paterson v. Sw. Bell Tel. Co.*, 411 F. Supp. 79 (E.D. Ok. 1976)).

[58] D.I. 41 at 4.

16

convalescence period.[59]

The parties agree that Morningred was injured on May 29, 2008. According to Dr. Marks, whose opinion Sedgwick CMS "ultimately relied," Morningred would not have been able to return to work until an unknown date between July 9, 2008 and July 23, 2008, respectively six to eight weeks after Morningred's injury. However, Sedgwick CMS concluded that its medical findings did not "support physical disability from performing [Morningred's] regular unrestricted job from July 1, 2008 through November 28, 2008." Sedgwick CMS's ruling denying short-term disability from July 1, 2008 through November 28, 2008 contradicts Dr. Marks' finding that Morningred required a six to eight week recovery period following her injury. As a result, the court finds that Sedgwick CMS's finding regarding the date that Morningred was able to return to work is not supported by substantial evidence.[60]

## IV. Remedy

Morningred asks the court to enter judgment for short-term disability benefits in her favor and to remand to the administrator to consider an application for long-term

---

[59] See D.I. 31, Ex. C at SMM 00038 ("After six to eight weeks post injury (sprain/strain type), one could expect reasonably good recovery."); Id. ("'The description of the injury and the lack of major anatomic findings do not support a disability from work after the initial six to eight weeks of convalescence."); Id. (Although a fall could have caused a sprain injury, the lack of solid physical findings of major severity is not supportive of complete disability from work (following the six to eight weeks of convalescence).").

[60] The court does not find the discrepancy in Dr. Marks' report is evidence of an unlawful or impermissible bias against Morningred. Rather, the error appears to be a result of (1) an answer to a direct question "Is the employee disabled from her regular unrestricted job as of 7/01/08 to 11/28/08" and (2) a mathematical mistake. There is no evidence demonstrating any bias on behalf of Dr. Marks and his numerous and concurrent references to Morningred's necessary "six to eight weeks" of convalescence and the July 1, 2008 to November 28, 2008 disability period suggest nothing more sinister than an error in counting.

disability benefits. However the proper remedy in such situations is a remand to Sedgwick CMS for a determination of whether Morningred was unable to engage in her customary occupation as a result of a demonstrable injury or disease.[61] If Sedgwick CMS determines that Morningred is entitled to short-term disability benefits throughout the short-term disability period, Morningred must then exhaust her administrative remedies before appealing to the court for a judgment concerning long-term disability.

V.    **Conclusion**

The court finds that Morningred's procedural claim concerning Sedgwick CMS's initial denial letter is waived due to her failure to exhaust administrative remedies. The court also finds that the Plan and Sedgwick CMS properly considered all the relevant medical evidence and properly exercised its discretion to weigh conflicting medical evidence in termination Morningred's STD benefits. Sedgwick CMS, and the independent medical examiner upon whom Sedgwick relied, properly recognized Morningred's physicians' conclusions that she was totally disabled as a result of complex regional pain syndrome. Additionally, the court finds that the Plan was not bound by the Morningred's workers' compensation claim and the bare payment agreement, without more, cannot evidence a violation of the administrator's discretion.

However, Dr. Marks' decision is inconsistent regarding the dates of Morningred's disability status and, as a result, Sedgwick CMS's reliance upon that report to deny Morningred's short-term disability benefit for the period between July 1, 2008 and July 23, 2008 is not supported by substantial evidence. Therefore, consistent with the

---

[61] *See generally Conkright v. Frommert*, 130 S. Ct. 1640, 1644 (2010) (finding that "a single honest mistake in plan interpretation" does not strip the administrator of deference granted to them by the plan and ERISA).

findings herein, defendants' motion for summary judgment (D.I. 30) and Morningred's cross-motion for summary judgment (D.I. 36) are hereby granted in part and denied in part. The court remands this case to the administrator for a determination of whether Morningred was unable to engage in her customary occupation as a result of a demonstrable injury or disease during the time period between July 1, 2008 and July 23, 2008.

Dated: March 29, 2011 /s/ Mary Pat Thynge
UNITED STATES MAGISTRATE JUDGE